**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**ST. JOSEPH DIVISION**

| | | |
|---|---|---|
| ROBIN L. SEITZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:15-cv-06151-NKL |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is Plaintiff Robin Seitz's appeal of the Commissioner of Social Security's final decision denying his application for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act. For the following reasons, the Commissioner's decision is affirmed.

## I.       Background

Plaintiff Robin Seitz is a 42-year-old man with a high school education and military experience.  Seitz performed past work in construction, automotive production, and as a corrections officer.  In his application filed on September 21, 2012, Seitz alleges a disability onset date of May 2, 2010 stemming from asthma, chronic bronchitis, sleep apnea, hearing loss, tinnitus, high blood pressure, anxiety, depression, and borderline personality disorder.

1

### A. Medical History

On January 26, 2010, Seitz presented at Walnut Medical Clinic with a sinus headache. [Tr. 242]. He also reported a sore throat and cough. Seitz was diagnosed with acute sinusitis and acute asthmatic bronchitis. [Tr. 243].

Thereafter, in late 2012, Seitz received treatment for asthma and anxiety at the VA Heartland Clinic. He reported low energy, difficulty sleeping, and irritability as a result of relationship trouble and losing his job, among other stressors. [Tr. 298]. Seitz told Deborah Hartfield, RN, that he no longer fished or hunted and often chose to isolate himself, but that he still enjoyed reading books. *Id.* Dr. Amand Din, M.D., diagnosed Seitz with major depressive disorder. [Tr. 302]. Dr. Din observed that Seitz's condition was stable and that his appearance, speech, affect, thought processes, perception, and judgment were all unremarkable, but determined that Seitz could benefit from individual therapy. *Id.* Seitz's GAF score was assessed at 55. Seitz declined to pursue therapy, but agreed to start on Zoloft and Trazodone. *Id.*

On October 30, 2012, Seitz returned to the Heartland Clinic complaining of a bronchial cough. [Tr. 269]. Upon exam, his respirations were deep and unlabored, and his lung sounds were diminished but clear. *Id.* Dr. Jeffrey Sweetwood, D.O., diagnosed Seitz with asthma and bronchitis, opining that Seitz needed a replacement nebulizer and refill of albuterol. [Tr. 270]. Seitz was instructed to take these medications, drink more water, and stop smoking. [Tr. 269]. Dr. Sweetwood assessed Seitz's GAF score at 60 and opined that his condition did not require steroids at that time. [Tr. 270].

On the same visit, Seitz also presented to Dr. Jay Banister, M.D., a psychiatrist. Seitz complained that he was feeling anxious and depressed, and that he did not believe his medications were still working. *Id*. Dr. Banister observed that Seitz was "somewhat irritable" and continued to have difficulty sleeping. [Tr. 271]. He increased Seitz's sertraline and Trazodone doses. *Id*.

Seitz presented again to Dr. Sweetwood on December 21, 2012, complaining of sinus pain, bronchitis, and a painful cough. [Tr. 378]. Dr. Sweetwood noted that Seitz's medical problems included asthma, hypertension, allergies, weight loss, tobacco use disorder, insomnia, depressive disorder, and anxiety disorder. [Tr. 378]. He instructed Seitz to continue his inhaler regimen. [Tr. 379].

Seitz then followed up with Dr. Banister on January 7, 2013, complaining of anxiety and depression. [Tr. 373]. Seitz reported that the hydroxyzine was not working and that it was causing him dry mouth. [Tr. 373]. He further reported that he was still experiencing insomnia and his anxiety was making it difficult to be around people. *Id*. However, Seitz also remarked that his mood had improved since Christmas and he had decreased his smoking frequency. *Id*. In progress notes, written by Dr. Terry Chance, M.D., Seitz was found to be alert and well-groomed, with linear thought processes and good insight. [Tr. 374]. Dr. Banister concluded that Seitz should continue his medication regimen, begin therapy, and start taking a daily dose of Clonazepram. [Tr. 375]. Seitz was instructed to follow within eight weeks. *Id*.

The Clonazepram was effective for about ten weeks, but then Seitz returned to the Heartland Clinic in March 2013, complaining of renewed anxiety, irritability, and

3

depression. [Tr. 351]. Seitz reported, however, that he was having less trouble sleeping. *Id*. Upon examination, Seitz was assessed as calm and alert, with good insight and judgment. [Tr. 353]. Dr. Chance and Dr. Banister concluded that Seitz was stable; they increased his dose of Zoloft and instructed him to continue with Clonazepram and Trazodone. *Id*.

The record shows Seitz presented to Dr. Banister, Dr. Tiffany Pendleton, D.O., and Dr. Thomas Legg, D.O., several times over the course of 2013. In June, Seitz was observed as stable on a regimen of Zoloft and Trazodone. [Tr. 514]. In July, Seitz reported anger and depression, with stable sleep patterns but low motivation. *Id*. Dr. Pendleton assessed his GAF score at 55-60. [Tr. 516]. She started Seitz on Buspar and encouraged him to stop smoking, but Seitz declined tobacco cessation medications. [Tr. 517]. In August, Dr. Legg increased Seitz's Buspar dose after he complained of irritability, irregular sleep, and decreased motivation. [Tr. 495]. In September, Seitz complained of irritability and depression. [Tr. 456]. Dr. Pendleton found him "somewhat anxious" but cooperative and pleasant. [Tr. 458]. Dr. Pendleton and Dr. Banister decided to discontinue Seitz's Buspar dose, substituting Remeron alongside unchanged doses of Zoloft and Trazodone. [Tr. 459]. Seitz was encouraged to pursue therapy, become more physically and socially active, and stop smoking. *Id*.

Seitz also continued to present with asthma symptoms. On January 15, 2013, he underwent a pulmonary function test at the VA Heartland Clinic, which found that Seitz suffered from a severe obstructionist defect with moderate air trapping. [Tr. 369]. However, his diffusion capacity was normal and he demonstrated a significant response

4

to a bronchodilator.  *Id*.  In March, Seitz presented to Dr. Cedric Franklin Rutland, M.D., with persistent asthma symptoms.   Dr. Rutland observed that Seitz had been noncompliant with his morning and evening asthma regimen, which was contributing to regular breathing problems during the night.  [Tr. 348].  Dr. Rutland concluded that Seitz needed to be vigilant about taking his medications correctly and regularly.  [Tr. 349].  He further determined that Seitz should stop smoking and prescribed nicotine patches to help promote this outcome.  *Id*.  Likewise, in an addendum, Dr. Trenton Nauser, M.D., remarked that Seitz's asthma was poorly-controlled due to smoking and non-compliance with medication, particularly Symbicort.  *Id*.  Seitz was advised on the importance of compliance and smoking cessation.  *Id*.

Seitz presented again to Dr. Nauser on May 30, 2013, where he reported compliance with Symbicort, which had been effective in improving his asthma symptoms.  [Tr. 624].  Seitz also reported that he had stopped smoking for a month, which further improved his symptoms, but that he had started smoking again.  [Tr. 623]. Dr. Nauser prescribed Nicotine patches and instructed Seitz to continue his asthma medications.  [Tr. 624].  Moreover, because Seitz had recently fractured his left ankle, Dr. Nauser also arranged for Seitz to use a wheelchair and begin taking Vitamin D to counter his steroid-induced osteoporosis.  *Id*.  The record demonstrates that Seitz later tried to stop smoking again, with improved asthma symptoms, but then resumed his tobacco use.  [Tr. 488].

Following his left ankle fracture, Seitz was hospitalized twice in 2013, first in May and then in June.  In May, Seitz was treated for cellulitis before Dr. Robert Worsing,

5

M.D., performed open reduction and internal fixation for his left medial and posterior malleolar fracture. [Tr. 627-30]. After the surgery, Seitz was prescribed Percocet and instructed to avoid weight-bearing on his ankle for six weeks. [Tr. 626].

In June, Seitz returned to the hospital due to a left ankle infection following his surgery. [Tr. 404-07]. The infection was diagnosed as superficial. [Tr. 404]. Seitz was advised to change his dressings, refrain from scratching the wound, and return for a follow-up in two weeks. [Tr. 404-05]. Seitz was also told that he could ambulate and perform range of motion exercises, but that he should not bear weight on his left lower extremity while it healed. [Tr. 405]. Upon discharge, Seitz was prescribed doxycycline, although he later reported that the medication was ineffective and his ankle was still causing discomfort. [Tr. 512-13]. Seitz followed-up on his ankle in September 2013 to have a screw surgically removed. After the procedure, Seitz reported that he was having no problems with the left ankle and had returned to full weight-bearing. [Tr. 454]. Seitz was instructed to continue increasing his physical activities, to the degree tolerable, and to discontinue using tobacco. [Tr. 454-55].

Seitz also reported pain in his right shoulder following a fall in August 2013. [Tr. 499]. On November 8, 2013, Seitz had a right shoulder arthroscopy for acromioclavicular osteoarthritis and a rotator cuff tear. [Tr. 430]. Seitz was instructed to keep his upper extremity elevated for a few days and avoid bearing weight on his right arm. [Tr. 421-22]. A week afterwards, Seitz presented with a swollen shoulder and an infection at the incision site. [Tr. 416]. Seitz reported pain, red streaking, and pus at the site, but declined advice that he seek care at a nearby emergency room. [Tr. 415].

6

In 2014, Seitz presented to Dr. Rohini Negi, M.D., for psychiatric treatment. Seitz reported that his anxiety had improved, but he was worried about an upcoming meeting and unable to sleep. [Tr. 784]. He requested medication to help his sleep and anxiety until the meeting took place, at which point Seitz expected to feel better. *Id*. Dr. Negi observed that Seitz had responded well to Remeron, and accordingly increased that dosage. [Tr. 786]. Dr. Negi also encouraged Seitz to continue taking Zoloft and Trazodone, become more physically and socially active, and begin psychotherapy. *Id*. Seitz was referred to Dr. Ian Lynam, Ph.D., for therapy. [Tr. 787]. Thereafter, Seitz attended therapy with Dr. Lynam in February and March, 2014. Dr. Lynam discussed coping techniques and ways Seitz could handle anxious situations. [Tr. 783]. At Seitz's visit on March 21, 2014, Seitz reported that he had successfully applied these techniques in social situations. [Tr. 782].

Dr. Raphael Smith, Psy.D., a non-examining state psychologist, reviewed Seitz's record in advance of the hearing. Dr. Smith opined that Seitz had mild daily living restrictions, moderate difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence, or pace. [Tr. 59]. Based on his review, Dr. Smith found a history of major depressive disorder and anxiety, but noted that Seitz's symptoms displayed some improvement with medication, did not interfere with many daily activities, were not reported in all treatment notes, and were caused in part by situational stressors. *Id*. Accordingly, Dr. Smith found Seitz "partially credible" regarding his mental impairments and concluded that the severity of his alleged symptoms was not supported on the record. [Tr. 60]. Dr. Smith opined, however, that

7

Seitz should work in "an environment where he does not have to work with large numbers of people." [Tr. 59].

Regarding Seitz's physical impairments, Dr. Smith opined that only one impairment, asthma, could be considered severe, and that Seitz was able to control his asthma with medications. [Tr. 62]. In assessing Seitz's functional capacity, Dr. Smith determined he could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand for six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and that he should avoid exposure to fumes, odors, dusts, gases, and poor ventilation. [Tr. 61-62].

Seitz's record also contains a disability decision from the Department of Veterans Affairs, which, in 2013, assigned a ten percent disability rating to Seitz's knee injuries. [Tr. 387]. In the same decision, the Department denied disability for hearing loss, tinnitus, asthma, adjustment disorder, major depressive disorder, and anxiety disorder. [Tr. 388].

At his hearing, Seitz testified that he rarely leaves his home because he does not want to be around people, does not feel like going out, and often is tired and groggy as a result of his medications. [Tr. 42]. Instead, Seitz stated he relies on family to do most of his shopping, cooking, and cleaning, although he does his own laundry and manages his personal hygiene. [Tr. 35, 44-45]. Seitz further testified that his asthma is exacerbated by weather changes, odors, and other stimulants. [Tr. 42]. As a consequence, Seitz stated, he performs breathing treatments four to five times daily, which takes 20 minutes

per session and causes him fatigue.  *Id*.  Otherwise he spends most of the day sleeping and watching television.  [Tr. 46].

Seitz testified to physical limitations due to his impaired left leg, which he has broken twice.  [Tr. 40].  Seitz explained he can walk only 100 yards and stand for only 10 minutes before the leg starts hurting.  [Tr. 43].  This pain requires him to elevate and ice the leg on a daily basis, for a period of 45 to 60 minutes each time.  [Tr. 43, 47].  Moreover, as a result of his shoulder injury, Seitz testified that he cannot lift objects above his head or lift more than 20 pounds before his arm starts burning.  [Tr. 44].

A vocational expert also testified at Seitz's hearing.  In response to the ALJ's hypothetical question, which described an individual who was limited to light work and could occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; occasionally stoop, kneel, and crouch; never crawl; occasionally balance and bend; occasionally reach with the right upper extremity; could not be exposed to fumes, odors, dust, gases, poorly ventilated areas, and extreme temperatures; and could only work in a low-stress job with occasional decision-making, changes in the work setting, and interaction with the public, co-workers, and supervisors, the vocational expert testified that there are light jobs within the national economy that an individual with these limitations could perform.

### B.  ALJ's Decision

After the hearing, the ALJ issue a decision on June 10, 2014.  He found that Seitz suffers from the following severe impairments: anxiety, depression, asthma, and left ankle pain.  [Tr. 15].  Relying on the vocational expert's testimony, the ALJ concluded

that Seitz is unable to perform past relevant work, but considering his age, education, experience, and limitations, Seitz could find other jobs that exist in significant numbers in the national economy.

As part of this analysis, the ALJ assessed Seitz's RFC as follows:

[Seitz] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can occasionally climb ramps or stairs but never climb ladders, ropes, or scaffolds; he can occasionally stoop, kneel, crouch but never crawl; he can occasionally balance and bend; he can frequently reach and occasionally reach overhead with his right upper extremity; he must avoid all exposure to extreme cold like in a freezer, extreme heat like in a hot plant, and all concentrated exposure to pulmonary irritants such as fumes, odors, dust, gases, and poorly ventilated areas; he is limited to unskilled and low stress work defined as only occasional decision making, changes in work setting, and judgment required on the job; and he can tolerate occasional interaction with coworkers, supervisors, and the public.

[Tr. 17-18].

The ALJ reached this RFC by giving "considerable weight" with Dr. Smith's opinion because it was consistent with the evidence on record. [Tr. 21]. The ALJ gave "partial weight" to the Department of Veterans Affairs decision because, while it assigns disability for a knee impairment, the record does not reflect Seitz ever received continuous treatment for this injury. *Id*. Likewise, the ALJ gave "partial weight" to the GAF scores assessed by Seitz's physicians; although his scores were consistent with multiple unremarkable mental status exams, the ALJ found, these scores still only reflect a snapshot at a particular point in time. [Tr. 22]. Finally, the ALJ determined that Seitz's complaints were not entirely credible because "the overall record shows that [Seitz's]

allegations about the intensity, persistence and functionally limiting effects of his symptoms are not substantiated by the objective medical evidence." [Tr. 19]. In reaching this conclusion, the ALJ noted that Seitz's problems with asthma was likely caused by smoking and non-compliance with treatment, yet was still effectively managed with a bronchodilator; that Seitz had satisfactorily recovered from his ankle surgery and subsequent infection; and that Seitz's mental impairments were stable and controllable with medication. [Tr. 19-21].


## II.     Discussion

A district court will reverse the Commissioner's findings "only if they are not supported by substantial evidence or result from an error of law." *Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). Seitz argues that the ALJ erred, first in formulating his RFC and second in giving considerable weight to Dr. Smith's opinion. He further argues that substantial evidence does not support the ALJ's determination at Step 5 of the sequential evaluation process, which found Seitz capable of performing other jobs that exist in significant numbers in the national economy.

### A.  Seitz's Physical RFC

A claimant's RFC reflects "what the claimant can still do" despite the combined effects of her credible limitations. *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 416.945. When formulating an RFC, "the ALJ is required to set forth specifically a claimant's limitations and to determine how those limitations affect" her exertional capacities. *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003). The

11

claimant nevertheless carries the burden of proving her RFC.  *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).

### 1. Evidence Supporting the Physical RFC

Seitz argues that the record lacks any medical opinion regarding his physical impairments—even though it contains other non-opinion, medical evidence—and therefore the ALJ's RFC cannot be based on substantial evidence.[1]  As such, Seitz maintains the ALJ should have developed the record further by ordering a consultative exam.

Because a claimant's RFC is a medical question, it must be supported by "some medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000), that addresses his "ability to function in the workplace," *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000).  An "ALJ [is] required to consider at least some supporting evidence from a professional" when making this determination.  *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001).  However, an ALJ may satisfy this obligation by considering a professional's treatment notes, even if that professional did not provide a formal opinion on the record.[2]

---

[1]    Dr. Smith's opinion considered Seitz's physical limitations as well as his mental impairments. Nevertheless, Seitz argues that "[t]here are no medical opinions of record as to the physical functional limitations stemming from [Seitz's] 'severe' and 'non-severe' physical impairments," [Doc. 13, p. 11], and the Defendant does not challenge this contention.  The Court will thus apply Dr. Smith's opinion only to Seitz's mental impairments for purposes of this order, because under either approach the ALJ's decision is supported by substantial evidence on the record.

[2]    Seitz appears to argue that the record must contain a formal opinion, defined as a "statement[]" from an acceptable medical source.  20 C.F.R. § 404.1527(a)(2).  Yet the cases he cites do not support this narrow proposition.  Rather, Seitz's cases demonstrate only that an ALJ must consider the whole record and cannot render a decision inconsistent with it.  *See Lauer*, 245 F.3d at 704 (finding the ALJ relied on evidence that conflicted with the opinions provided by treating sources); *Anderson*, 51 F.3d at 779 (affirming a denial of benefits where the ALJ relied on "reviewing physicians" and "also conducted an independent analysis of the medical evidence"); *Feston v. Astrue*, 2011 WL 2314199, at *3 (W.D. Mo. June 9, 2011) (reversing an ALJ's decision that discounted all opinions on the record and then cherry-

Case 5:15-cv-06151-NKL   Document 18   Filed 07/18/16   Page 12 of 26

*See Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995) (in addition to formal medical opinions, "relevant evidence" includes "medical records, observations of treating physicians and others, and [the claimant's] own description of her limitations").

In *Bowling v. Colvin*, 2016 WL 3094064 (W.D. Mo. June 1, 2016), the same issue was addressed. The *Bowling* court remarked:

> Plaintiff contends the ALJ did not properly develop the record before determining his RFC. Although the record contains medical evidence generally, Plaintiff argues the record was insufficient to assess his RFC because it did not contain an *opinion* from a medical source regarding his functional limitations.
>
> This argument is based on the faulty assumption that an ALJ must have a medical opinion to assess the claimant's RFC, and that absent a medical opinion any RFC determination is invalid. If accepted, this argument would shift the burden of proving RFC from the claimant to the Commissioner. But it is the claimant's burden to prove his RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000) ("The parties engage in a lengthy dispute over whether RFC is properly evaluated at step four or step five, and over who bears the burden of demonstrating RFC. We reiterate that RFC is determined at step four, where the burden of proof rests with the claimant."). While the ALJ has some duty to develop the record, the ALJ is not required to obtain additional evidence where, as here, the record is already well-developed, even in the absence of a medical opinion. *See Tellez v. Barnhart*, 403 F.3d 953, 956-57 (8th Cir. 2005); *see also Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (noting a medical opinion is not necessary to assess a claimant's RFC).

*Bowling*, 2016 WL 3094064, at *2 (emphasis in original).

picked supporting facts); *Weatherly v. Colvin*, 2013 WL 3807624, at *2 (W.D. Mo. July 22, 2013) (reversing and remanding where the ALJ discounted all functional evaluations on the record); *Arn v. Astrue*, 2011 WL 3876418, at *4 (W.D. Mo. Sept. 1, 2011) (finding the ALJ failed to consider non-opinion medical evidence on the record).

13

Therefore, the Court's present task is to determine whether Seitz's record is sufficiently well-developed, even in the absence of a formal opinion, such that the medical evidence provides substantial support for the RFC. Having considered Seitz's record, the Court finds that the medical evidence supports the ALJ's conclusions. Regarding Seitz's asthma, the record shows that this impairment was effectively controlled by treatment, [Tr. 263, 343, 367] (all noting a "significant response" to a bronchodilator), and that Seitz repeatedly failed to heed doctors' admonitions that he stop smoking, [Tr. 280, 290, 335, 349, 356, 365, 413, 450, 459, 493, 517, 718]; *see also Strickland v. Barnhart*, 143 F. App'x 726, 727 (8th Cir. 2005) (failure to quit smoking can constitute substantial evidence where the claimant is encouraged to quit and the smoking creates a condition preventing her from working).[3] The record further reveals that Seitz's breathing was often clear upon exam. [Tr. 284, 438, 477, 482-83, 491, 510, 565, 602, 622, 640, 653, 659, 668, 687, 702]. While the ALJ still found Seitz's asthma "severe," the extent of this impairment, as Dr. Nauser observed, was "likely due to medication non-compliance and smoking." [Tr. 349].

Regarding his ankle pain, the medical evidence shows Seitz repeatedly demonstrated a normal gait and full range of motion. [Tr. 444, 477, 510, 568]. The record further reveals that Seitz was capable of walking and exercising, and in fact, was

---

[3] In his reply brief, Seitz remarks that "[c]igarette smoking is a very difficult habit to break." [Doc. 17, p. 4]. The Court recognizes this challenge. However, while the record does show, as Seitz argues, that he attempted to quit on multiple occasions, the record also indicates that his efforts were not consistent and he repeatedly declined assistance from his physicians. *See, e.g.,* [Tr. 356] ("[Seitz] declined [an] offer for smoking cessation assistance."). When a claimant fails to heed his doctor's recommendations that he quit smoking, and this failure sufficiently contributes to his condition, an ALJ may assess persistent cigarette smoking in determining disability. *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000).

14

encouraged by his physicians to increase his activity levels. [Tr. 405, 411, 485]. Outside of the temporary limitations assessed when he was recuperating from surgery, no treatment notes from any of Seitz's physicians suggest that his physical impairments were permanent and incapacitating. A finding of disability was therefore unjustified. *Hensley v. Barnhart*, 352 F.3d 353, 357 (8th Cir. 2003).

In short, Seitz's record contains substantial medical evidence supporting the ALJ's conclusion. While Seitz maintains the ALJ should have developed the record further, he bears the burden of proving disability. *Wiseman v. Sullivan*, 905 F.2d 1153, 1156 (8th Cir. 1990). In the absence of other support for the physical severity Seitz claims, the lack of a formal medical opinion does not satisfy this burden; if anything, it weakens the merits of his appeal. *See Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000) ("We find it significant that no physician who examined [the claimant] submitted a medical conclusion that she is disabled and unable to perform any type of work.").

Even so, Seitz contends that his physical RFC still should have included two additional limitations—his need to periodically administer breathing treatments and elevate his legs during the day. Seitz derives these limitations from his own testimony at the administrative hearing. *See* [Tr. 40, 42]. Given that the ALJ ultimately discounted Seitz's credibility and found the severity of Seitz's physical impairments less restrictive than alleged, the ALJ was not obligated to include these limitations in the RFC.[4] *Goff v. Barnhart*, 421 F.3d 785, 794 (8th Cir. 2005).

---

[4]    Seitz does not challenge the ALJ's credibility determination on this appeal.

Substantial evidence thus supports the physical limitations included by the ALJ on Seitz's RFC.

### 2. Formulation of the Physical RFC

In assessing Seitz's physical RFC, the ALJ limited him to "[l]ight work as defined in 20 C.F.R. 404.1567(b) and 416.967(b)." [Tr. 49]. Seitz argues that by articulating this limit in exertional terms—"light work"—without providing a function-by-function assessment of his ability to sit, stand, walk, push, and pull, the ALJ failed to comply with the social security regulations. Social Security Ruling 96-8p provides that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96-8p, 1996 WL 374184 (July 2, 1996). As Seitz points out, the same regulation likewise states that "[e]ach function must be considered separately." *Id*.

Seitz's argument offers an incomplete picture of Social Security Ruling 96-8p. When considered more broadly, the regulation sets out the following process: first, when assessing an RFC, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments;" second, the ALJ then "must address both the *remaining* exertional and nonexertional capacities of the individual." *Id*. (emphasis added). In other words, if the ALJ properly discusses the claimant's impairments, the RFC does not need to address all functional areas. Rather the ALJ is only required to discuss functions for which limitations are supported by the record. *Depover v. Barnhart*, 349 F.3d 563,

16

567-68 (8th Cir. 2003) ("[A]lthough we would have preferred that [the ALJ] had made specific findings as to sitting, standing, and walking, we do not believe that he overlooked those functions. We think instead that the record reflects that the ALJ implicitly found that [the claimant] was not limited in these areas.").

In *Depover*, as Seitz notes, the Eighth Circuit distinguished its holding from *Pfitzner v. Apfel*, 169 F.3d 566 (8th Cir. 1999), a case where the ALJ concluded only that the claimant "retain[ed] the residual functional capacity to perform a wide range of medium work." *Pfitzner*, 169 F.3d at 568. Conversely, in *Depover*, the ALJ made specific findings in several relevant functional areas.

Seitz's case is more analogous to *Depover* than *Pfitzner*. In limiting Seitz to "[l]ight work as defined in 20 C.F.R. 404.1567(b) and 416.967(b)," the ALJ provided several specific findings. He restricted Seitz's ability to "lift[] no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567. The ALJ further did not preclude jobs that "require[] a good deal of walking or standing." *Id*. Finally, in addition to limiting Seitz to light work, the ALJ assessed physical limitations on Seitz's ability to stoop, climb, kneel, crouch, crawl, bend, balance, and tolerate exposure to pulmonary irritants. [Tr. 49-50].

Considering that substantial evidence on the record supports the ALJ's assessment of Seitz's symptoms, these limitations do not amount to reversible error. *See Thorndyke v. Colvin*, 2015 WL 5522513, at *3 (W.D. Mo. Sept. 18, 2015) ("[T]he ALJ's reference to Plaintiff's "light work" is subsequently supported by the ALJ's additional discussion of the evidence used to determine the RFC."). *See also Van Vickle v. Astrue*, 539 F.3d

17

825, 830 (8th Cir. 2008) (an error is harmless where it has no bearing on the outcome). Likewise, even if the ALJ did not conduct the analysis in the proper order, as set out in Social Security Ruling 96-8p, such "deficiency in opinion-writing" also does not warrant reversal. *Johnson v. Astrue*, 2012 WL 511286, at *4 (W.D. Mo. Feb. 15, 2012) (*quoting Draper v. Barnhart*, 426 F.3d 1127, 1130 (8th Cir. 2005)).

The ALJ therefore did not err in assessing Seitz's RFC.

### B. Weight Given to Dr. Smith's Opinion

Seitz also challenges the weight given to Dr. Raphael Smith's opinion. Because Dr. Smith was a non-examining state physician, Seitz argues that his opinion cannot constitute substantial evidence to support the ALJ's decision. Yet as the Eighth Circuit has remarked, "[i]t is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment." *Harris v. Barnhart*, 356 F.3d 926, 931 (8th Cir. 2004). *See also Hacker v. Barnhart*, 459 F.3d 934, 939 (8th Cir. 2006) ("The regulations specifically provide that the opinions of non-treating physicians may be considered.") (*citing* 20 C.F.R. § 404.1527(f)).

Seitz relies on a line of Eighth Circuit cases where the opinion of a non-examining consulting physician was not afforded any weight. Those cases make clear, however, that such an opinion "does not *generally* constitute substantial evidence," *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) (emphasis added), and thus it "alone cannot be considered substantial evidence in the face of the conflicting assessment of a treating physician," *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999). In each case, therefore,

18

the Eighth Circuit discounted the consulting physician's opinion because it was inconsistent with other, more persuasive evidence on the record, not simply because it was provided by a non-examining consultant. *See Jenkins*, 196 F.3d at 925; *Kelley*, 133 F.3d at 589; *Hancock v. Secretary of Dept. of Health, Educ. and Welfare*, 603 F.2d 739, 740 (8th Cir. 1979); *Metz v. Shalala*, 49 F.3d 374, 378 (8th Cir. 1995).[5]

Seitz's case is accordingly distinguishable. He has not shown, and does not argue, that Dr. Smith's opinion is inconsistent with the medical record as a whole. He also does not argue that Dr. Smith failed to provide support for his conclusions. *See* 20 C.F.R. § 404.1527(d)(3) (the weight given to non-examining sources should depend on the degree they provide support for their assessment). Instead, Seitz challenges Dr. Smith's opinion on several alternative grounds: he maintains that this opinion cannot constitute substantial evidence because (1) it cannot be distinguished from that of the single decision-maker and (2) it was rendered over a year before the ALJ's decision.

First, Seitz maintains that it is impossible to determine which part of Dr. Smith's opinion is his and which part is that of the single decision-maker. A single decision-maker is not an acceptable medical source, and thus any record he produces cannot constitute substantial evidence. 20 C.F.R. § 404.906(b)(2). However, the Court has reviewed Dr. Smith's opinion in the record and concludes, contrary to Seitz's argument,

---

[5]     Seitz also cites to *Nevland v. Apfel*, 204 F.3d 853 (8th Cir. 2000), a case where the ALJ relied solely on the opinion of non-examining consulting physicians. The Eighth Circuit found "there is no *medical* evidence about how [the claimant's] impairments affect his ability to function now," and that "this does not satisfy the ALJ's duty to fully and fairly develop the record." *Id.* at 858 (emphasis in original). *Nevland* applies only at Step 5 of the sequential evaluation process, once the claimant has shown she cannot perform past work and the burden of production shifts to the Commissioner. *Harris*, 356 F.3d at 931 n. 2; *Eichelberger*, 390 F.3d at 591.

Case 5:15-cv-06151-NKL   Document 18   Filed 07/18/16   Page 19 of 26

that Dr. Smith's signature is plainly displayed at the bottom of each assessment he provides. *See* [Tr. 59-64]. The Court is satisfied that the medical opinion provided immediately above Dr. Smith's signature is his own.

Second, Seitz asserts that his condition worsened in the year between Dr. Smith's opinion and the ALJ's decision, and so the opinion does not adequately reflect Seitz's ability to function now. An ALJ may not rely on older evidence while ignoring subsequent evidence that supports the claimant's allegations. *Morse v. Shalala*, 32 F.3d 1228, 1230 (8th Cir. 1994). Yet the evidence in Seitz's record does not demonstrate a material change in his mental impairments following Dr. Smith's opinion. Subsequent to Dr. Smith's opinion, which was issued on December 12, 2012, Seitz's mental impairments were deemed "stable" upon examination on March 18, 2013 and his self-reported mood improved from "irritable" to "alright" to "good" between July 2013 and January 2014. [Tr. 353, 413, 515, 786]. During this same time, Seitz was assessed a stable GAF score ranging from 55 to 60. [Tr. 516, 784]. While Seitz points out that he reported anxiety and depression during consultations in 2013, and that his physicians made several modifications to his medications, none of this evidence is inconsistent with Seitz's earlier medical record or with Dr. Smith's conclusions.

Finally, in the alternative, Seitz argues that if Dr. Smith's opinion can constitute substantial evidence, the ALJ should have adopted it in its entirety upon giving the opinion "considerable weight"—or else the ALJ should have explained why he did not include all of the limitations assessed by Dr. Smith. Specifically, Seitz points to Dr.

Smith's conclusion that he "should have limited contact with large groups of people."[6] [Tr. 64]. In the RFC, however, the ALJ found only that Seitz should have "occasional interaction with co-workers, supervisors, and the public." [Tr. 50]. The Court finds that this language in the RFC adequately captures Dr. Smith's limitation. *See Christopher-Dell v. Colvin*, 2014 WL 4840692, at *13 (E.D. Mo. Sept. 29, 2014) (limiting claimant to unskilled work and "only occasional interaction with the public" captures fears of being around crowds).[7]

Similarly, Seitz also points to Dr. Smith's finding that he is "[m]oderately limited" in his "ability to carry out detailed instructions." [Tr. 63]. Here as well, Seitz argues that the ALJ should have adopted these limitations or explained why they were being discounted; had the ALJ done so, the jobs identified by the vocational expert—which all require at least level 2 reasoning—would have conflicted with the RFC. Seitz relies on cases from the Western District of Missouri where the ALJ found the claimant limited in performing detailed tasks, but ultimately decided, based on the vocational expert's testimony, that the claimant could perform jobs involving level 2 reasoning. *See McPheeters v. Astrue*, 2013 WL 523674, at *2 (W.D. Mo. Feb. 12, 2013); *Bray v. Colvin*,

---

[6] While Seitz argues that Dr. Smith "repeatedly opined [Seitz] should not work where there are a large number of people," [Doc. 13, p. 14], this is an overly-broad reading of Dr. Smith's opinion, as quoted above, *see* [Tr. 64]. An opinion that the claimant should have limited contact with large groups does not indicate an inability, beyond what the ALJ assesses in the RFC, to interact in the workplace. *See McKeithen v. Colvin*, 2015 WL 4104923, at *9 (N.D. Iowa July 6, 2015) (affirming an RFC where the claimant was "limited to no large groups of people" but could also have "occasional interaction with the general public, co-workers, and supervisors").

[7] In his reply brief, Seitz maintains that *Christopher-Dell* is distinguishable because no medical opinion in that case found limitations with crowds; instead, the claimant herself merely testified to being fearful around crowds. *Christopher-Dell*, 2014 WL 4840692, at *13. Regardless, the Eastern District of Missouri held that "occasional interaction with the public" directly "credited" those fears. *Id.* The Court finds this conclusion persuasive and similarly determines that "occasional interaction with the public" directly credits Dr. Smith's opinion regarding large groups of people.

2013 WL 6510743, at *2 (W.D. Mo. Dec. 12, 2013); *Mehrens v. Colvin*, No. 4:14-cv-00051-FJG-SSA, Doc. 13 (W.D. Mo. Dec. 18, 2014). These cases are accordingly distinguishable. In assessing Seitz's RFC, the ALJ never mentioned an inability to carry out detailed instructions.

While Seitz argues, nevertheless, that the ALJ should have explained why he did not adopt Dr. Smith's finding in this area, Seitz has emphasized only a narrow component of Dr. Smith's opinion: the check-marked MRFC form. An ALJ is not required to include or explain a moderate limitation based on a checked-marked box on the MRFC. *See Robertson v. Colvin*, 2014 WL 106117, at *5 (W.D. Mo. Jan. 10, 2014). In Dr. Smith's narrative section, moreover, he remarks that Seitz is "capable of performing at least low skill work (and likely some more complex work)." [Tr. 59]. In light of this language, the Court cannot say Dr. Smith's opinion unambiguously precludes Seitz from performing detailed tasks. *See Robertson*, 2014 WL 106117, at *5 (looking to the opinion's narrative section to clarify the MRFC form). *See also Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010) ("[I]f it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, we must affirm the ALJ's decision.").

Substantial evidence thus supports the ALJ's assessment of Dr. Smith's opinion and the mental limitations included on Seitz's RFC.

### C. Vocational Expert Testimony

At Step 5 of the sequential evaluation process, the burden of production shifts to the Commissioner, *Harris*, 356 F.3d at 931, who must produce evidence "that other work

exists in substantial numbers in the national economy that the claimant is able to perform," *Eichelberger*, 390 F.3d at 591. Seitz argues that the Commissioner has not sustained her burden because the vocational expert was given an improper hypothetical question and then provided testimony that conflicts with the Dictionary of Occupational Titles.

First, Seitz notes that the ALJ found "moderate difficulties in . . . concentration, persistence, or pace," but that these limitations were not present in the hypothetical question, which described only an individual limited to "unskilled work in a low stress job defined as [a job with] only occasional decision making required, only occasional changes in the work setting, [and] only occasional judgments required on the job." [Tr. 50]. While an ALJ's hypothetical question must be "properly phrased" to constitute substantial evidence, *Howard v. Massanari*, 255 F.3d 577, 581-82 (8th Cir. 2001), it "need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments," *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996). When drawing this line, the Eighth Circuit has asked whether a hypothetical question adequately captures the impairments at issue. *Howard*, 255 F.3d at 581-82.

In *Howard*, the Eighth Circuit proceeded to find that "the ALJ's hypothetical concerning someone who is capable of doing simple, repetitive, routine tasks adequately captures [the claimant's] deficiencies in concentration, persistence or pace." *Id*. at 82. Seitz relies on *Brachtel v. Apfel*, 132 F.3d 417, 421 (8th Cir. 1997) for the opposite proposition: that "deficiencies in concentration, persistence, or pace must be given in a hypothetical question." [Doc. 13, p. 14]. But this is not what *Brachtel* holds. Rather,

23

*Brachtel* found that the "ability to do only simple routine repetitive work, which does not require close attention to detail" adequately captured deficiencies of concentration, persistence or pace.[8] *Brachtel*, 132 F.3d at 421.

Both *Howard* and *Brachtel* are analogous because the ALJ, in this case, described a hypothetical individual who could perform only "unskilled work in a low stress job." [Tr. 50]. As in *Howard* and *Brachtel*, this description sufficiently captures concentration deficiencies by limiting Seitz to unskilled work, which is defined in the regulations as work "need[ing] little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 416.968(a). It further captures persistence and pace deficiencies by stipulating that the job must be a "low stress" one. *See Brachtel*, 132 F.3d at 421 (examining whether the hypothetical question contains language restricting the pace of the work that the individual can perform).

Second, Seitz argues that the vocational expert provided testimony that conflicts with the DOT, and therefore, because the ALJ did not resolve this conflict, the testimony cannot constitute substantial evidence on the record. The vocational expert testified that Seitz could perform several jobs that exist in significant numbers in the national economy, including that of a sub-assembler. The vocational expert identified the DOT code for this job as 729.684054. However, in his decision, the ALJ identified a different

---

[8]     Seitz also relies on *Summy v. J. Astrue*, 2012 WL 1555436 (W.D. Mo. Apr. 30, 2012) and *Porter v. Colvin*, 2015 WL 3843268 (W.D. Mo. June 22, 2015). These cases are distinguishable. In *Summy*, the Court instructed the ALJ, on remand, to address concentration, persistence, and pace issues "[b]ecause the Court is already remanding this case on other grounds." *Summy*, 2012 WL 1555436, at *5. In *Porter* as well, the Court addressed the issue in context of an ALJ decision that disregarded substantial evidence on the record and thus was already being remanded for further proceedings. *Porter*, 2015 WL 3843268, at *7.

code—726.685-066—which is in fact the DOT code for a semiconductor bonder.  *See* DOT 726.685-066 (Bonder, Semiconductor).  Focusing on this discrepancy, Seitz argues that the vocational expert and ALJ both effectively identified sub-assembly as a "light" job, when the code used by the ALJ describes a "sedentary" position instead.

Where a conflict exists between the vocational expert's testimony and the DOT's job description, the ALJ carries an affirmative obligation to explain and resolve this disagreement.  SSR 00-4p, 2000 WL 1898704 (December 4, 2000).  For purposes of this order, the Court will assume that the ALJ's use of an incorrect DOT code reflects such a conflict.  Consequently, because the ALJ did not resolve the conflict, the vocational expert's testimony that Seitz can perform the job of sub-assembler will not be treated as substantial evidence.  *See Jones v. Barnhart*, 315 F.3d 974, 979 (8th Cir. 2003).

However, if the ALJ's error is harmless, the Court need not remand or reverse Seitz's case.  *Renfrow v. Astrue*, 496 F.3d 918, 920-21 (8th Cir. 2007) (finding that the ALJ's failure to ask about conflicts was a harmless error).  Even assuming that substantial evidence does not support Seitz's ability to work as a sub-assembler, the vocational expert identified two other jobs that Seitz has not challenged: wire wrapping machine operator and small parts assembler.  Between these two occupations, the vocational expert further testified that 1,010 jobs exist in Missouri and 304,000 exist in the national economy.  [Tr. 50-51].  These figures constitute substantial evidence supporting the ALJ's conclusion that there are a significant number of jobs in the economy Seitz can perform.  *See Weiler v. Apfel*, 179 F.3d 1107, 1110-11 (8th Cir. 1999) (one available occupation with 32,000 jobs nationally constitutes substantial evidence);

*Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997) (650 jobs in the state and 30,000 jobs nationally constitute substantial evidence).

Accordingly, the record contains substantial evidence that Seitz can perform jobs that exist in significant numbers in the national economy.

## III.    Conclusion

For the foregoing reasons, the Commissioner's decision is affirmed.


s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  July 18, 2016
Jefferson City, Missouri